Filed 8/3/23  P. v. Vale CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>MAURICE LAMAR VALE,<br><br>Defendant and Appellant. | C096624<br><br>(Super. Ct. No. 18FE018423) |

Defendant Maurice Lamar Vale was convicted of murdering Trevor Solari during the course of a robbery that was set up by Richard Wallace.  The plan was for defendant to rob Solari of a backpack full of cash and marijuana.  Solari was showing off the contents of the backpack while at a friend's apartment after a night of drinking.  Wallace, who was also at the apartment, contacted defendant and arranged for him to rob Solari when he left the apartment.  But when Solari fell asleep on the couch, Wallace let defendant inside.  Rather than take the backpack and leave, however, defendant decided

1

he also wanted the gold necklaces that were draped around the sleeping Solari's neck. Solari woke up when defendant grabbed the necklaces. Defendant shot him in the chest, ending his life, and left the apartment with two of the necklaces and the backpack.

A jury convicted defendant of first degree murder, first degree robbery, and unlawful possession of a firearm. With respect to the murder, the jury found true a special circumstance allegation that the murder was committed during the commission of a robbery. With respect to both the murder and the robbery, the jury also found true an enhancement allegation that defendant personally and intentionally discharged a firearm causing death. The trial court sentenced defendant to serve an indeterminate prison term of life without the possibility of parole for the murder plus 25 years to life for the firearm enhancement.

On appeal, defendant contends: (1) the trial court prejudicially abused its discretion in denying his motion for new trial, which was based on the fact that Wallace perjured himself while testifying against defendant at trial; (2) the trial court prejudicially erred and violated defendant's federal constitutional rights by (A) denying his request to instruct the jury on theft as a lesser included offense to robbery and (B) instructing the jury with CALCRIM No. 376 on the use of evidence that defendant knew he was in possession of stolen property as it relates to the charge of murder; and (3) the cumulative prejudicial effect of these claims of instructional error requires reversal.

We affirm. As we shall explain, the trial court did not abuse its discretion in denying the new trial motion. While Wallace lied about certain things during his testimony, the trial court understood its duty to independently assess the evidence, properly did so, and concluded the evidence was nevertheless sufficiently probative to sustain the jury's verdict. The trial court also properly refused defendant's request to instruct the jury on theft as a lesser included offense. Defendant's second instructional error claim has merit, but the error was manifestly harmless given the strength of the

2

evidence adduced against him at trial. Finally, there being no cumulative prejudice to assess, defendant's final claim also fails.

## FACTS

We begin our recitation of facts by acknowledging that Wallace perjured himself at trial. He clearly sought to mitigate his role in this robbery/murder, and in doing so, lied about at least one matter on the witness stand. We assess the relative importance of Wallace's perjury during the discussion portion of this opinion. For now, we note that our recitation of facts will be based, as much as possible, on the testimony of the other witnesses. Where a fact is based on Wallace's testimony, we say so, and also set forth the corroborating evidence.

### *Events Leading to the Murder*

On the night of August 3, 2018, Donavon Bell went to a night club in Old Sacramento with his girlfriend and a group of friends. The group included two brothers, Terrance and Traee Benson.[1] Wallace was either part of the group from the start or met up with them at the club. Bell considered Terrance and Traee to be good friends, but knew Wallace only through a mutual friend. That mutual friend was apparently Terrance, who testified that he was close friends with both Wallace and Bell.

Solari was also at the club that night. Bell described his relationship with Solari as "somewhat friends," but explained that he "kind of kept [his] distance a little bit" because "[Solari] was into certain things that [Bell] wasn't into." While Bell would not confirm that Solari sold drugs, he acknowledged that Solari "dressed like a drug dealer as far as, like, the chains and . . . more expensive clothes." Terrance confirmed that Solari liked to wear gold chains and described him as "a pretty flashy guy."

---

[1] Due to their common surname, we refer to Terrance and Traee Benson by their first names.

3

The group left the club at around closing time. After dropping Bell's girlfriend off at his apartment on Howe Avenue, they went to have a party at a "little chicken spot across the street," where they stayed for about an hour before returning to Bell's apartment at about 3:30 a.m. Between drinking at the club and the party, the group members were fairly intoxicated when they got back to the apartment.

Solari did not join them at the party, but was outside Bell's apartment when they returned. Solari was also intoxicated. He was agitated and yelling about "a missing gun from his car." Bell invited him inside so that he could "calm down and catch a breath." Solari took him up on the offer and came in with a designer backpack. Wallace, Terrance, and Traee also came inside. Other people were also at the apartment and many in the group continued to drink.

While inside the apartment, Solari opened his backpack and showed Terrance 10 bands of cash and a bag of marijuana. Terrance believed each band contained $1,000. He also believed the bag of marijuana contained about two pounds of the substance. At some point, Bell saw Wallace and Solari "bickering a little bit" in the kitchen. When Bell retired to his bedroom at about 5:30 a.m., only Terrance, Traee, and Solari remained in his living room. As we describe below, Wallace was outside setting up the robbery.

### The Set Up

We now rely on Wallace's testimony for his account of setting up the robbery. Wallace testified that he was in the same room when Solari showed Terrance the cash and marijuana in his backpack. According to Wallace, Solari was "kind of showing off" and saying, "he gets money, and it doesn't matter that he took a small loss that day." Wallace also heard Solari complaining earlier that someone stole his gun from his car. Wallace wanted to take the cash and marijuana and thought that doing so would be easy because Solari was unarmed. However, because Wallace was five feet seven inches tall and weighed "around like 150 pounds, 140 pounds," he thought he "needed someone stronger . . . to take the items." So, Wallace sent a series of text messages to a person he

4

thought could pull it off, the father of his sister's children, who was "6 foot, maybe about 210 pounds." According to Wallace, the text messages read: "Are you up?" "I got one." "No hammer." "15 grand on the line." Wallace explained that he estimated Solari had $15,000 in the backpack and that "no hammer" meant Solari did not have a gun.

When the first person Wallace messaged did not respond, he messaged defendant, who he estimated to be "5' 9", 230." Wallace's text message to defendant asked whether he was awake and provided the address for Bell's apartment. When defendant responded, Wallace stepped outside the apartment and called him. Wallace told defendant, "I got a lick," meaning he had someone who could be robbed. According to Wallace, nothing else was said until defendant arrived at the apartment complex.

Defendant arrived at the apartment complex in a dark sedan with a woman in the car. He was wearing a gray hooded sweatshirt. Wallace and defendant spoke briefly in the parking lot about the robbery. According to Wallace, defendant was supposed to "wait until . . . Solari left out of the residence" and then "[j]ust take his stuff and leave." While Wallace expected to receive something for setting up the robbery, they did not discuss how much his cut would be. Wallace then returned to the apartment.

Having recounted Wallace's account of setting up the robbery, we pause here to note that much of it is corroborated. As mentioned, Terrance testified that Solari showed him the cash and marijuana in the backpack. The forensic pathologist testified that Solari was five feet five inches tall and weighed 178 pounds, slightly shorter than Wallace, but also quite a bit heavier, corroborating Wallace's claim that he thought he needed someone stronger to forcibly take Solari's property. Terrance described the suspect who shot the victim, later determined to be the defendant, to be approximately six feet one inch tall, "200-and-something pounds." Cell phone data confirmed that Wallace sent a text message to defendant at about 4:45 a.m. and then called him about 20 minutes later. During the call, defendant's cell phone connected to a cell tower in South Sacramento, where his girlfriend at the time lived. That girlfriend testified that defendant was at her

5

house during the early morning hours of August 4, 2018, and that she joined him when he drove to an apartment complex on Howe Avenue in a black car. The fact that defendant traveled to Bell's apartment that morning was also corroborated by the cell phone data, which showed that Wallace again called defendant at about 5:20 a.m., during which defendant's cell phone connected to a cell tower near the apartment. Finally, defendant's cousin testified that she rented a black sedan for defendant to drive during the summer of 2018.

### *The Robbery and Murder*

Returning to the narrative, after Wallace planned the robbery with defendant in the parking lot and returned to the apartment, he found Traee already asleep on the couch. Traee confirmed he was the first to fall asleep. Wallace testified that everyone else was also "winding down" for the night. Eventually, Terrance and Solari also fell asleep on opposite ends of the couch. While Wallace testified that he too fell asleep, the cell phone data shows that 12 text messages were exchanged between Wallace's cell phone and defendant's cell phone between 5:20 a.m. and the time defendant entered the apartment.

Defendant entered the apartment at about 6:06 a.m. His entry was captured on surveillance video. An enhanced version of this footage, made using the video player's zoom feature isolated over the front door, shows a silhouette opening the door to let him in. Again, Wallace claimed to be asleep at the time. He also denied informing defendant that the target of the robbery had fallen asleep in the apartment. According to Wallace, because the plan was for defendant to rob Solari outside the apartment, and the sleeping Solari "probably wasn't going to leave," Wallace thought "nothing was going to happen at that point," so he too went to sleep. Wallace testified that he woke up to "a large sound" that he thought was the front door. Terrance also woke up. Defendant was standing in front of Solari, who was still asleep on the couch. After shooting Solari, defendant turned to Wallace and Terrance with Solari's backpack in his hand, slightly

6

lifted the gun with his other hand to generally point it in Wallace's direction, and said, "Don't say anything," before leaving the apartment.

Terrance testified that he woke up to "a loud thud." This was apparently the door, as Wallace suggested, because only one shot was fired, and Terrance went on to describe the shooting. Terrance testified that when he woke up, a gunman was standing over Solari, who was still asleep on the couch. Terrance did not identify the gunman. However, the only other people in the room at the time were his brother Traee and Wallace. Traee was still asleep. And Terrance was adamant that the gunman was not Wallace. Terrance testified that the gunman was grabbing the gold chains that were around Solari's neck. This apparently woke Solari up, who said, "Naw, Bro, or something like that," while trying to get up. Terrance then "heard a pop" and Solari "went right back down." The gunman then went through Solari's pockets and "just vanished." Terrance's testimony was consistent with statements he made the morning of the murder, and during questioning he testified that the gunman could have also taken Solari's backpack as he had told the officer.

Defendant left the apartment about three minutes after he entered, carrying Solari's backpack. Wallace left the apartment about 13 minutes later. Their departures were also captured on surveillance video.

Meanwhile, Terrance woke up Bell and they both called 911. When first responders arrived a short time later, Solari was already dead. He died from a single gunshot wound to the chest.

### *Defendant's Subsequent Conduct*

Additional text messages and phone calls were exchanged between Wallace and defendant after the murder, followed by the two meeting in person, during which defendant gave Wallace $1,200 in cash and some of the marijuana taken during the robbery. According to Wallace, when he asked defendant why he shot Solari, defendant

7

did not answer and asked Wallace whether he needed to worry about Wallace telling anyone about it. Wallace said, "no" and also told defendant not to contact him anymore.

Defendant was arrested at his girlfriend's house the following month. The girlfriend testified that defendant ran into the house when police arrived. Her son testified that he was asleep when defendant woke him up by loudly entering his bedroom. Defendant went to his dresser and said: "I need your lighter. The police are outside." While the son did not see defendant put anything in the dresser, when it was later searched, one of the gold chains defendant took from Solari was found inside. About one pound of marijuana and $1,300 in cash was also found at the house.

Police also searched defendant's cell phone and found photos of him wearing the gold chains taken from Solari. One of the photos was taken about 12 hours after the murder.

DISCUSSION

I

*New Trial Motion*

Defendant contends the trial court prejudicially abused its discretion in denying his motion for new trial, which was based on the fact that Wallace perjured himself while testifying against defendant at trial. We disagree.

A.    *Additional Background*

Wallace testified pursuant to a plea agreement requiring him to testify truthfully. After Wallace testified at his judgment and sentencing, the trial court raised a doubt concerning whether he had fulfilled this obligation of the agreement. The trial court thereafter rejected the plea bargain, finding that Wallace did not testify truthfully when he claimed to have been asleep when defendant entered the apartment.

8

Defendant then moved for a new trial under Penal Code[2] section 1181, subdivision (6) (section 1181(6)), arguing that Wallace's perjury rendered the remainder of his testimony "inherently unreliable," and because he was the only witness to identify defendant as the shooter, "there was insufficient evidence to find that [defendant] committed murder."

In response, the People acknowledged Wallace's perjury and pointed out that the jury received the cell phone evidence demonstrating that Wallace was lying about being asleep, but nevertheless conceded that the trial court "would be well within its rights to decide that it would be a 'holdout for acquittal' sitting as the 13th juror, in which case [d]efendant would be granted a new trial under . . . section 1181(6)." The People argued, however, that because the evidence was sufficient to support the verdict, principles of double jeopardy should not bar a retrial.

The trial court denied the motion. At the hearing, prior to specifically ruling on the motion, the trial court expressed "zero doubt, none at all, that this jury very quickly figured out that Mr. Wallace was . . . minimizing his own involvement in the actual conduct that led to the death of Mr. Solari -- he simply wanted to say, well, I was sleeping, so I can't be held responsible, when the truth of the matter is -- and it was clear -- is he and [defendant] together permitted [defendant] to enter the residence."

The trial court then stated there was an "overwhelming amount of evidence tying [defendant] to this crime," from the surveillance video showing defendant entering the apartment, to "traffic cameras demonstrating he's driving someplace he has absolutely no reason to be driving at 4 o'clock in the morning, other than in response to text messages sent by the very person who was soliciting him to commit the robbery," to navigation data on defendant's cell phone, to "property of the victim not only in his possession but

---

[2] Undesignated statutory references are to the Penal Code.

9

also him wearing it mere days after the murder was committed," to "testimony of both his girlfriend and her son." With respect to whether defendant was the shooter, the trial court stated: "That issue was very much resolved by the witness, Terrance Benson. I found him to be very credible. And what he -- it's what he says that puts [defendant] right in the cross hairs of being the murderer, because you don't have to believe anything that Richard Wallace said. [¶] You can take the circumstantial evidence that placed [defendant] right in the middle of this crime scene, and then you combine that with what was said by Terrance Benson. What Terrance Benson said very clearly is, I don't know who did the shooting. I don't know who did it. But the circumstances demonstrate that that was [defendant], because the only person in the apartment he didn't know was the shooter. [¶] And what he did know -- he knew who Richard Wallace was. And he knew absolutely for certain, Richard Wallace was not the one doing the shooting, because he was laying on the ground."

The trial court again found Terrance "to be incredibly believable throughout" his testimony and added: "So I think circumstantially, the evidence in this case, when taken in total, along with direct evidence from within the apartment itself, disregarding almost every single thing that Mr. Wallace said, demonstrates [defendant] was the shooter. [¶] I would also say much of what Mr. Wallace said was corroborated. So there were things that he was very truthful about."

The trial court then noted, among other things, that the new trial motion required it to "independently determine credibility," and that it "kind of played [its] hand a little bit in advance," but invited argument from counsel. Defense counsel stated he would submit on the briefing. The People, represented by a Deputy District Attorney who was not the prosecutor at trial, agreed with the trial court's assessment that the evidence against defendant was overwhelming and stated that the People "decided to concede this motion . . . through an abundance -- and maybe an overabundance -- of caution." The People further explained that "the fact that a court has found Mr. Wallace to have perjured

10

himself and invalidated the plea agreement in the case gave [the People] some concern as to what our ethical obligations were in terms of defending or conceding a new trial."

The trial court acknowledged the People were in a "tricky" position, but stated that it had seen the testimony first-hand, adding: "That's why I'm in a position to be able to indicate that when I say that I find the testimony of Terrance Benson to be credible is because I sat here and watched him testify." The trial court further indicated that it had "re-gone over all [its] notes" taken during the trial and provided a summary of the testimony of the key witnesses. We need not recite that summary here. Much of the testimony relied upon by the trial court is recounted in our statement of facts. We note, however, that the trial court repeated its assessment that Terrance gave a "very clear articulation that Richard Wallace had nothing to do with firing the firearm." The trial court concluded: "There's a -- certainly a lot more evidence than that, but the clarity with which this case ultimately played out demonstrated beyond any reasonable doubt, anybody that actually watched the testimony, that the defendant was the shooter in this case and not Mr. Wallace."

## B. *Analysis*

Section 1181(6) "permits a defendant to move for a new trial on the ground that the verdict is contrary to the evidence. In deciding such a motion, the trial court's function is to 'see that the jury intelligently and justly perform[ed] its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict.' [Citation.] The trial court's duty is to review the evidence independently and satisfy itself that the evidence as a whole is sufficient to sustain the verdict. [Citation.]" (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251 (*Dickens*).)

In ruling on a new trial motion under section 1181(6), "[t]he trial court is not bound by the jury's determinations as to the credibility of witnesses or as to the weight or effect to be accorded to the evidence. [Citations.] Thus, the presumption that the verdict

11

is correct does not affect the trial court's duty to give the defendant the benefit of its independent determination as to the probative value of the evidence. [Citation.] If the court finds that the evidence is not sufficiently probative to sustain the verdict, it must order a new trial. [Citations.]" (*Dickens*, *supra*, 130 Cal.App.4th at pp. 1251-1252.) "In doing so, the judge acts as a 13th juror who is a 'holdout' for acquittal. Thus, the grant of a section 1181(6) motion is the equivalent of a mistrial caused by a hung jury." (*Porter v. Superior Court* (2009) 47 Cal.4th 125, 133.) However, if the trial court instead finds the evidence is sufficiently probative to sustain the verdict, the motion must be denied, and judgment entered on the verdict reached by the jury.[3] (*Ibid.*)

"The trial court has broad discretion in determining whether the evidence has sufficient probative value to sustain the verdict [citation], and its order will not be reversed on appeal 'absent a manifest and unmistakable abuse of that discretion.' [Citation.]" (*Dickens*, *supra*, 130 Cal.App.4th at p. 1252.) "The [trial] court abuses its discretion, however, where it misconceives its duty, applies an incorrect legal standard, or fails to independently consider the weight of the evidence." (*People v. Carter* (2014) 227 Cal.App.4th 322, 328.)

Thus, on appeal from the denial of a new trial motion, we do not simply assess the verdict for substantial evidence. This is because the trial court must grant such a motion, even where the verdict is supported by substantial evidence, if it determines the weight of the evidence favors acquittal. (*People v. Carter*, *supra*, 227 Cal.App.4th at pp. 328-329.) But where the evidence is sufficient to support the verdict, and the trial court denies the

---

[3] There is a third option where the trial court finds the evidence is not sufficiently probative to support the verdict, but is sufficiently probative to support conviction of a lesser degree of the crime or a lesser included offense. In such a case, the trial court may modify the verdict to reflect conviction of the lesser degree or lesser included offense. (*Porter v. Superior Court*, *supra*, 47 Cal.4th at p. 133; *People v. Lagunas* (1994) 8 Cal.4th 1030, 1039.)

motion with a proper understanding of its duty to independently assess the evidence, we may not interfere with the ruling. (*People v. Nuno* (1928) 89 Cal.App. 1, 4 ["if the trial court denies a motion for a new trial upon conflicting evidence the appellate courts will not interfere with the ruling"]; *People v. Radovich* (1932) 122 Cal.App. 176, 180 ["evidence was amply sufficient to sustain the verdict of the jury, and their conclusion, sustained by the denial of the trial court of the motion for a new trial, is final"].)

Here, the trial court expressly stated its understanding that it was required to independently assess the evidence, and then methodically went over that evidence, finding the evidence placing defendant inside the apartment during the robbery to be "overwhelming" and finding Terrance's testimony, specifically that Wallace was not the shooter and that he did not know who the shooter was, to be "very credible" and "incredibly believable." As the trial court noted, the only people in the living room when Solari was shot were Solari, Wallace, Terrance, Traee, and defendant. Everyone agreed Traee was sleeping, and Solari did not shoot himself. Defendant does not argue otherwise. This leaves Wallace, Terrance, and defendant. Wallace identified defendant as the shooter, and although the trial court found he was "absolutely not credible" when he claimed he was asleep and did not let defendant in the apartment, the trial court also found he was "very truthful" when testifying about matters that were corroborated by other evidence. Terrance corroborated Wallace's identification of defendant as the shooter by testifying that the shooter was not Wallace. That left only defendant. Moreover, by testifying that he did not know who the shooter was, Terrance effectively identified defendant because defendant was the only person in the living room that he did not know. The trial court, independently assessing the evidence, credited Terrance's testimony in this regard, and concluded the evidence was sufficiently probative to sustain the jury's verdict. There was no abuse of discretion.

Nevertheless, defendant argues the trial court's focus on Terrance's testimony and circumstantial evidence placing defendant inside the apartment "does not address the

13

reality that this trial was tainted by the perjured testimony of a key witness and that the jury might very well have relied on Wallace's false testimony in convicting [defendant], in violation of [his] undeniable right to due process of law." In making this argument, defendant relies on the well-established principle that a prosecutor's knowing use of false testimony in order to obtain a criminal conviction, or failure to correct such testimony, violates a defendant's due process rights, citing *People v. Vines* (2011) 51 Cal.4th 830, disapproved on another point in *People v. Hardy* (2018) 5 Cal.5th 56, and *People v. Sakarias* (2000) 22 Cal.4th 596. Defendant also notes that this was why the People conceded the new trial motion below.

We do not dispute the foregoing principle. However, the specific claim raised on appeal is that the trial court abused its discretion under section 1181(6), not that the People's presentation of false evidence or failure to correct such evidence amounts to reversible constitutional error. Perhaps because of this framing of the issue, there is no specific argument in defendant's appellate briefing establishing that the People *knowingly* presented false testimony when Wallace testified that he was asleep when defendant entered the apartment. Nor is there any argument that the cell phone evidence presented by the People, from which the trial court concluded Wallace lied about being asleep, did not satisfy the People's obligation to correct the false testimony. Defendant's appellate briefing also omits any argument that this claimed due process violation was prejudicial. Any direct argument that this underlying constitutional claim requires reversal is therefore forfeited for failure to provide adequate legal analysis in defendant's appellate briefing. (See *300 DeHaro Street Investors v. Department of Housing & Community Development* (2008) 161 Cal.App.4th 1240, 1257.)

Rather than brief the constitutional issue, defendant simply asserts his due process rights were violated by Wallace's admittedly false testimony and argues the trial court therefore abused its discretion in denying the new trial motion. Defendant has not, however, persuaded this court that any assumed constitutional violation required the trial

court to grant his new trial motion even if it concluded, after independently assessing the evidence, that the verdict should be sustained. The latter does not automatically follow from the former, as defendant's briefing assumes. As we have already explained, the trial court properly understood its duty to independently assess the evidence and did not abuse its discretion in denying the new trial motion.

Finally, even if defendant's underlying constitutional claim were properly before us in this appeal, and even if we were to conclude such a violation occurred, reversal is required only if the false evidence was not harmless beyond a reasonable doubt. (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1194-1195.) Setting aside defendant's failure to even attempt to establish this prerequisite to reversal, we conclude Wallace's false testimony about being asleep and not letting defendant inside the apartment was harmless beyond a reasonable doubt. The evidence against defendant was overwhelming, for all the reasons stated by the trial court in ruling on the new trial motion. As the trial court also observed, "I have *zero doubt*, *none at all*, that this jury very quickly figured out that Mr. Wallace was . . . minimizing his own involvement in the actual conduct that led to the death of Mr. Solari -- he simply wanted to say, well, I was sleeping, so I can't be held responsible, when the truth of the matter is -- *and it was clear* -- is he and [defendant] together permitted [defendant] to enter the residence." (Italics added.) We share the trial court's lack of doubt.

In sum, with respect to the issue properly raised in this appeal, the trial court did not abuse its discretion in denying defendant's motion for a new trial. And any assumed due process violation was harmless beyond a reasonable doubt.

## II

### *Instructional Error Claims*

Defendant also asserts two claims of instructional error. As we explain, the first lacks merit and the second, while error, was harmless.

**A.      *Denial of Defendant's Request to Instruct on Theft***

Defendant first claims the trial court prejudicially erred and violated his federal constitutional rights by denying his request to instruct the jury on theft as a lesser included offense to robbery.  He is mistaken.

" 'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.]  'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' [Citations.]  'To justify a lesser included offense instruction, the evidence supporting the instruction must be substantial—that is, it must be evidence from which a jury composed of reasonable persons could conclude that the facts underlying the particular instruction exist.' [Citations.]  [¶]  ' "Conversely, even on request, the court 'has no duty to instruct on any lesser offense unless there is substantial evidence to support such instruction.' " [Citation.]  This substantial evidence requirement is not satisfied by " '*any* evidence . . . no matter how weak,' " but rather by evidence from which a jury composed of reasonable persons could conclude "that the lesser offense, but not the greater, was committed." [Citation.]  "On appeal, we review independently the question whether the trial court failed to instruct on a lesser included offense." [Citation.]' [Citation.]" (*People v. Souza* (2012) 54 Cal.4th 90, 115-116.)

"Robbery is the felonious taking of personal property in the possession of another, from his [or her] person or immediate presence, and against his [or her] will, accomplished by means of force or fear." (§ 211.)  Theft by larceny is the felonious taking of the personal property of another, without the additional elements of immediate presence and force or fear.  (§ 484, subd. (a); *People v. Williams* (2013) 57 Cal.4th 776, 786.)  Thus, theft is a lesser included offense of robbery.  (*People v. Friend* (2009) 47 Cal.4th 1, 51; *People v. Abilez* (2007) 41 Cal.4th 472, 513.)

16

Defendant argues the trial court erred by declining to instruct on theft because "evidence supported the scenario that [Solari's] backpack was taken while [he] was asleep and the shooting occurred after [defendant] had left the apartment." If there was such evidence, we would agree. But there is none. The evidence, recounted in detail above, established that defendant entered the apartment while Solari was asleep, grabbed Solari's gold chains, causing Solari to wake up and protest the taking, which in turn caused defendant to shoot him in the chest, remove the chains from his neck, go through his pockets, and take the backpack. This is a robbery, not a simple theft.

Defendant, however, points out that Wallace lied on the witness stand, and also questions the accuracy of Terrance's testimony because he was "highly intoxicated, was awakened by the sound of a gunshot after a short amount of sleep, saw a man he had not seen before, and thought he was dreaming." First, the assertion that Terrance awoke to the sound of the gunshot, rather than the sound of the front door shutting, is not supported by defendant's citations to the record. As stated previously, Terrance testified that he awoke to "a loud thud," saw the unknown gunman standing over Solari with his gun pointed at him, saw the gunman grab Solari's chains, heard Solari say, "Naw, Bro," and then "heard a loud pop" before the gunman took the chains and backpack. But second, even if the jury were to disbelieve both Wallace and Terrance based on Wallace's admitted perjury and Terrance's intoxicated state, this would not supply *affirmative evidence* that defendant actually took the backpack and chains while Solari was asleep and someone else, presumably Wallace, shot Solari after defendant left the apartment. In other words, if the jury disbelieved Wallace and Terrance, the result is an absence of evidence regarding what happened in the apartment during the critical moments of the taking and the shooting. Such an absence of evidence would certainly support a conclusion that the elements of robbery had not been proved beyond a reasonable doubt, but it would not support an affirmative finding that defendant took the property and left before the shooting occurred.

17

Defendant also claims circumstantial evidence supports a nonforcible taking. Not so. He first argues that Wallace's "fearful and shocked" look, something Terrance noted when describing the gunman shooting Solari, was not necessarily inconsistent with him having shot Solari himself. Maybe so, but it does not supply evidence that Wallace did, in fact, shoot Solari. Defendant also notes that Wallace and Solari were seen bickering in the kitchen earlier that night and there was no evidence of a previous relationship between defendant and Solari. Both true, but while Wallace bickering with Solari certainly supports a reasonable inference that he had perhaps personal reasons for setting up the robbery, it does not support a reasonable inference that defendant, having been called in to carry out that robbery, instead committed a simple theft, after which Wallace shot Solari to death. Nor does the lack of a prior relationship between defendant and Solari.

Defendant further cites the very testimony from Wallace that was found to be perjury, i.e., that Wallace went to sleep because he thought the planned robbery would not happen that night, and postulates from this that Wallace "could have acted precipitously" and "could have acted on impulse by shooting Solari after defendant left the apartment with the backpack." Finally, defendant suggests that "Wallace seemed to have no interest in Solari's gold chains . . . but he could have taken some of the chains to give to [defendant] with the expectation he would get some proceeds from the content of the backpack." This line of argument is pure speculation and "is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense." (*People v. Wilson* (1992) 3 Cal.4th 926, 942.)

The trial court did not err in declining defendant's request to instruct on theft as a lesser included offense.

## B. *CALCRIM No. 376*

Defendant also claims the trial court prejudicially erred and further violated his constitutional rights by instructing the jury with CALCRIM No. 376 on the use of

evidence that defendant knew he was in possession of stolen property as it relates to the charge of murder.  Although we agree there was error, we find that it was harmless.[4]

The jury was instructed with CALCRIM No. 376 as follows:  "If you conclude that the defendant knew he possessed property and you conclude that the property had in fact been recently stolen, you may not convict the defendant *of murder* based on those facts alone.  However, if you also find that supporting evidence tends to prove his guilt, then you may conclude that the evidence is sufficient to prove he committed *murder* and/or robbery.  [¶]  The supporting evidence need only be slight and need not be enough by itself to prove guilt.  You may consider how, where, and when the defendant possessed the property, along with any other relevant circumstances tending to prove his guilt of *murder* and/or robbery.  [¶]  Remember that you may not convict the defendant of any crime unless you are convinced that each fact essential to the conclusion that the defendant is guilty of that crime has been proved beyond a reasonable doubt."  (Italics added.)

The Attorney General properly concedes this instruction "should be given only for theft and theft-related crimes, and not murder."  Discussing substantially identical CALJIC No. 2.15, our colleagues at the Fourth Appellate District explained:  "Viewed in

---

[4] Defendant did not object to this instruction at trial, ordinarily resulting in forfeiture of the claim "unless the error affects defendant's substantial rights," i.e., "resulted in a miscarriage of justice under *People v. Watson* (1956) 46 Cal.2d 818 . . . ."  (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.)  Defendant argues "this kind of basic instructional error is reviewable on appeal even in the absence of an objection in the lower court."  The Attorney General apparently accepts defendant's assertion that the claim is not forfeited, observing "courts have held that failure to object does not forfeit a challenge to CALCRIM No. 376," citing *People v. O'Dell* (2007) 153 Cal.App.4th 1569, 1574 ["there is no forfeiture of an instructional issue on appeal where, as here, the issue raised asserts a violation of substantial constitutional rights"], and *People v. Lopez* (2011) 198 Cal.App.4th 698, 708 [same].  We follow the parties' lead, assume there was no forfeiture, and address the claim on the merits.

the abstract, it might be possible, even though unlikely, for a juror to read [the instruction], when given with reference to murder, to permit an inference of guilt of that crime merely from the possession of recently stolen property and 'slight' corroborating evidence. So read, such instruction would, as [the defendant] argues, unnecessarily inject possible confusion into an already complex area of law. Although [the instruction] has been held to be a permissive, cautionary instruction that inures to a criminal defendant's benefit when given with a theft-related offense [citation], given with regard to murder, the court is essentially singling out the fact of possession of recently stolen property as one that, if the jury finds it, will support a murder conviction with merely slight corroborating evidence. Because we do not believe the same natural and logical inferences for the crime of murder flow from the possession of stolen property coupled with slight corroborating evidence as for theft-related offenses like receiving stolen property, robbery and burglary, we cannot approve such an extension of this theft-related principle to the general crime of murder. Proof a defendant was in conscious possession of recently stolen property simply does not lead naturally and logically to the conclusion the defendant committed a murder to obtain the property." (*People v. Barker* (2001) 91 Cal.App.4th 1166, 1175-1176.)

The trial court therefore erred by extending CALCRIM No. 376 to defendant's murder charge. While defendant argues the error violated his federal constitutional rights and is therefore subject to harmless error analysis under *Chapman v. California* (1967) 386 U.S. 18, our Supreme Court made clear in *People v. Gamache* (2010) 48 Cal.4th 347 that the proper harmless error test for this error is that articulated in *People v. Watson*, *supra*, 46 Cal.2d 818. (*Gamache*, at p. 376.) And as in *Gamache*, "[u]nder that test— whether it is reasonably probable [defendant] would have obtained a more favorable result had the instruction not been given—the error here in extending [CALCRIM No. 376] to the murder charge was clearly harmless." (*Ibid.*) Aside from defendant's possession of Solari's gold chains, the evidence establishing that he shot and killed Solari

20

during the commission of the robbery was very strong.  Indeed, the direct and circumstantial evidence placing defendant inside the apartment was overwhelming.  Direct evidence also established that he was the shooter.  And while Wallace undoubtedly lied when he claimed he fell asleep and did not let defendant inside, almost everything else he said while testifying was corroborated by other evidence.  This includes the fact that defendant was the shooter, which was corroborated by Terrance's testimony, as we have already explained in considerable detail.

The error in extending CALCRIM No. 376 to defendant's murder charge was harmless.

### III

### *Cumulative Prejudice*

Because the requested theft instruction was properly denied, and the error in extending CALCRIM No. 376 to defendant's murder charge was harmless, there is no prejudice to accumulate.  We therefore reject defendant's assertion of cumulative prejudice.

DISPOSITION

The judgment is affirmed.

/s/
HORST, J.*

We concur:

/s/
EARL, P. J.

/s/
DUARTE, J.

---

*  Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.